ORIGINAL FILED

07 NOV 21 PM 1:14

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NO. DIST. OF CA. S.F.

E-filing

JSW

1 Bruce L. Simon (Bar No. 92641)
   bsimon@psswplaw.com
2 Esther L. Klisura (Bar No. 221171)
   eklisura@psswplaw.com
3 PEARSON, SIMON, SOTER, WARSHAW
   & PENNY, LLP
4 44 Montgomery Street, Suite 1200
San Francisco, CA 94104
5 Telephone:   (415) 433-9000
Facsimile:   (415) 433-9008
6
7 Thomas V. Girardi (Bar No. 36603)
   tgirardi@girardikeese.com
Jennifer Lenze (Bar No. 246858)
8   jlenze@girardikeese.com
GIRARDI KEESE
9 1126 Wilshire Boulevard
Los Angeles, CA 91101
10 Telephone:   (213) 977-0211
Facsimile:   (213) 481-1554
11
12 [Additional counsel listed on signature page]
*Counsel for Plaintiffs and the Class*
13
14                **UNITED STATES DISTRICT COURT**
15              **NORTHERN DISTRICT OF CALIFORNIA**
16
17 FRANKLYN AJAYE, MING-CHUN WU     Case No.
CHEN, TZU-CHIAO CHEN, RAYNA                          CV 07 5911
18 RUSENKO, TITI TRAN, BORIS
ZINGERMAN, and GALINA            **CLASS ACTION COMPLAINT FOR**
19 ZINGERMAN, on behalf of themselves   **DAMAGES**
and all others similarly situated,
20                                      **DEMAND FOR JURY TRIAL**
                Plaintiffs,
21
          vs.
22
AIR NEW ZEALAND, LTD., ALL
23 NIPPON AIRWAYS CO., LTD., CHINA
AIRLINES, LTD., EVA AIRWAYS
24 CORPORATION, JAPAN AIRLINES
CORPORATION, NORTHWEST
25 AIRLINES CORPORATION, QANTAS
AIRWAYS, LTD., SINGAPORE
26 AIRLINES, LTD., and THAI AIRWAYS
INTERNATIONAL PUBLIC COMPANY,
27 LTD.,
          Defendants.
28

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

## I.    INTRODUCTION

1.    Plaintiffs Franklyn Ajaye, Ming-Chun Wu Chen, Tzu-Chiao Chen, Rayna Rusenko, Titi Tran, Boris Zingerman, and Galina Zingerman, bring this action on behalf of themselves individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities in the United States who purchased passenger air transportation services containing at least one transpacific flight segment from one of the named defendants between January 1, 2004 and the present (the "Class Period").

2.    Defendants are among the largest airlines in the world, each flying millions of passengers a year.  Defendants service many of the same transpacific routes, and they are competitors of each other.  Plaintiffs allege that during the Class Period, defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which passenger air transportation services containing transpacific flight segments would be sold.

3.    As a result of defendants' unlawful conduct, plaintiffs and the other members of the Class paid artificially inflated prices for such passenger air transportation services. Such prices exceeded the amount they would have paid if the prices had been determined by a competitive market.

## II.    JURISDICTION AND VENUE

4.    Plaintiffs bring this action under Sections 4, 12 and 16 of the Clayton Act (15 U.S.C. Sections 15, 22 and 26) for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs with respect to the injuries sustained by plaintiffs arising from violations by defendants of the federal antitrust laws, including Section 1 of the Sherman Antitrust Act (15 U.S.C. Section 1).

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. Sections 1331, 1337(a) and 1367.

6.    Venue is proper in this judicial district pursuant to 15 U.S.C. Sections 15 and 22, and 28 U.S.C. Section 1391(b) and (c), in that defendants conduct a substantial amount of business in this judicial district.

/ / /

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

7.      Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of California.

### III.    PARTIES

**A.**    **Plaintiffs**

8.      Plaintiff Franklyn Ajaye is a resident of Los Angeles County, California. During the Class Period, plaintiff purchased passenger air transportation services containing transpacific flight segments from defendant Qantas Airways, Ltd.

9.      Plaintiff Ming-Chun Wu Chen is a resident of Santa Clara County, California. During the Class Period, plaintiff purchased passenger air transportation services containing transpacific flight segments from defendant EVA Airways Corporation.

10.      Plaintiff Tzu-Chiao Chen is a resident of Santa Clara County, California. During the Class Period, plaintiff purchased passenger air transportation services containing transpacific flight segments from defendant EVA Airways Corporation.

11.      Plaintiff Rayna Rusenko is a resident of New Hanover County, North Carolina. During the Class Period, plaintiff purchased passenger air transportation services containing transpacific flight segments from defendant Japan Airlines Corporation.

12.      Plaintiff Titi Tran is a resident of Los Angeles County, California. During the Class Period, plaintiff purchased passenger air transportation services containing transpacific flight segments from defendant EVA Airways Corporation.

13.      Plaintiff Boris Zingerman is a resident of Los Angeles County, California. During the Class Period, plaintiff purchased passenger air transportation services containing transpacific flight segments from defendant China Airlines, Ltd.

14.      Plaintiff Galina Zingerman is a resident of Los Angeles County, California. During the Class Period, plaintiff purchased passenger air transportation services containing transpacific flight segments from defendant China Airlines, Ltd.

**B.    Defendants**

15.    Defendant Air New Zealand, Ltd. ("Air New Zealand") is a New Zealand company headquartered at Level 19, Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand. Air New Zealand is considered the South Pacific's largest international carrier with a focus on Australia and the South Pacific. The airline provides service within New Zealand, as well as to and from Australia, the South Pacific, Asia, North America and the United Kingdom. Air New Zealand operates daily nonstop flights from San Francisco to Auckland. During the Class Period, Air New Zealand sold passenger air transportation services containing transpacific flight segments to and from the United States.

16.    Defendant All Nippon Airways Co., Ltd. ("All Nippon") is a Japanese company headquartered at Shiodome-City Center, 1-5-2, Higashi-Shimbashi, Minator-Ku, Tokyo 105-7133, Japan. All Nippon is Japan's second largest domestic and international airline after Japan Airlines Corporation, operating 49 domestic and 22 international routes. During the Class Period, All Nippon sold passenger air transportation services containing transpacific flight segments to and from the United States.

17.    Defendant China Airlines, Ltd. ("China Air") is a Taiwanese company headquartered at 131, Sec. 3, Nanking E Rd., Taipei, Taiwan. China Air was the first Asian carrier to fly the transpacific route between Taiwan and the United States. It services 68 cities in 25 countries. During the Class Period, China Air sold passenger air transportation services containing transpacific flight segments to and from the United States.

18.    Defendant EVA Airways Corporation ("EVA Air") is a Taiwanese company headquartered at 117, Sec. 2, Chang-An E. Rd., Taipei, 104, Taiwan. EVA Air is the largest privately owned Taiwanese airline. It operates passenger service to international destinations in Asia, Australia, New Zealand, Europe and North America. During the Class Period, EVA Air sold passenger air transportation services containing transpacific flight segments to and from the United States.

///

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

19.    Defendant Japan Airlines Corporation ("Japan Air") is a Japanese company headquartered at 4-11 Higashi-shinagawa 2 chome, Shinagawa-Ku, Tokyo 140-8638, Japan.  Japan Air was created in 2002 through the merger of Japan Airlines and Japan Air Systems.  Japan Air is one of the largest air carriers in the world and the largest airline operator in Asia.  During the Class Period, Japan Air sold passenger air transportation services containing transpacific flight segments to and from the United States.

20.    Defendant Northwest Airlines Corporation ("Northwest") is a Delaware corporation headquartered at 2700 Lone Oak Pkwy, Eagan, Minnesota 55121.  Northwest flies to more than 240 cities in North America, Asia, and Europe.  It operates more than 200 non-stop flights between the United States and Asia each week.  During the Class Period, Northwest sold passenger air transportation services containing transpacific flight segments to and from the United States.

21.    Defendant Qantas Airways, Ltd. ("Qantas") is an Australian company headquartered at 203 Coward Street, Mascot NSW 2020, Australia.  Qantas is the largest domestic and international carrier in Australia.  During the Class Period, Qantas sold passenger air transportation services containing transpacific flight segments to and from the United States.

22.    Defendant Singapore Airlines, Ltd. ("Singapore Air") is a Singaporean company headquartered at Airline House, 25 Airline Road, Singapore 819829.  Singapore Air is one of Asia's leading airlines.  During the Class Period, Singapore Air sold passenger air transportation services containing transpacific flight segments to and from the United States.

23.    Defendant Thai Airways International Public Company, Ltd. ("Thai Air") is a Thai company headquartered at 89 Vibhavadi Rangsit Road, Bangkok 10900, Thailand. Thai Air flies to 74 destinations in 34 countries on four continents.  During the Class Period, Thai Air sold passenger air transportation services containing transpacific flight segments to and from the United States.

/ / /

4

CLASS ACTION COMPLAINT FOR DAMAGES

1 | **C.    Agents and Co-Conspirators**

2 | 24.    The acts alleged against the defendants in this Complaint were authorized,

3 | ordered, or done by their officers, agents, employees, or representatives, while actively

4 | engaged in the management and operation of defendants' businesses or affairs.

5 | 25.    Certain other persons, firms, corporations and entities have participated as

6 | unnamed co-conspirators as defendants in the violations and conspiracy alleged herein.  In

7 | order to engage in the offenses charged and violations alleged herein, these co-conspirators

8 | have performed acts and made statements in furtherance of the antitrust violations and

9 | conspiracies alleged herein.

10 | 26.    At all relevant times, each defendant was an agent of each of the remaining

11 | defendants, and in doing the acts alleged herein, was acting within the course and scope of

12 | such agency.  Each defendant ratified and/or authorized the wrongful acts of each of the

13 | defendants.  Defendants, and each of them, are individually sued as participants and as

14 | aiders and abettors in the improper acts and transactions that are the subject of this action.

15 | ## IV.    CLASS ACTION ALLEGATIONS

16 | 27.    Plaintiffs bring this action both on behalf of themselves individually, and as

17 | a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on

18 | behalf of the following class (the "Class"):

19 | All persons and entities in the United States who purchased passenger air
20 | transportation services containing at least one transpacific flight segment to
   | or from the United States from one or more defendants between January 1,
21 | 2004 and the present.  The Class does not include: (1) defendants; (2)
   | defendants' parents, subsidiaries, or affiliates; (3) any governmental
   | entities; (4) any co-conspirators; or (5) any judicial officer to whom this
22 | case is assigned.

23 | 28.    Plaintiffs do not know the exact number of Class members because such

24 | information is in the exclusive control of defendants.  Plaintiffs believe that, due to the

25 | nature of the trade and commerce involved, there are most likely hundreds of thousands, if

26 | not millions, of Class members in the United States such that joinder of all Class members

27 | is impracticable.

28 | / / /

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

29.  Plaintiffs' claims are typical of the claims of the Class in that plaintiffs purchased passenger air transportation services containing transpacific flight segments from one or more defendants, all Class members were damaged by the same wrongful conduct, and the relief sought is common to the Class.

30.  Numerous questions of law or fact arise from defendants' anti-competitive conduct that is common to the Class.  These common questions include:

    a.    whether defendants engaged in a contract, combination or conspiracy among themselves to fix, maintain or stabilize the prices of, or allocate the market for, passenger air transportation services containing transpacific flight segments to and from the United States;

    b.    whether the defendants' conduct caused prices of passenger air transportation services containing transpacific flight segments to and from the United States to be artificially inflated to non-competitive levels; and

    c.    whether plaintiffs and other members of the Class were injured by defendants' conduct, and if so, the appropriate class-wide measure of damages and appropriate injunctive relief.

31.  These common questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members.

32.  Plaintiffs will fairly and adequately represent the interests of the Class in that they are typical purchasers of passenger air transportation services from defendants and have no conflicts with any other member of the Class.  Furthermore, plaintiffs have retained competent counsel experienced in antitrust and class action litigation.

33.  A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

34.  Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the defendants.

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

35. Injunctive relief is appropriate as to the Class as a whole because defendants have acted or refused to act on grounds generally applicable to the Class.

36. Plaintiffs reserve the right to expand, modify or alter the Class definition in response to information learned during discovery.

## V.    TRADE AND COMMERCE

37. During the Class Period, defendants sold substantial quantities of passenger air transportation services containing transpacific flight segments to and from the United States in a continuous and uninterrupted flow of interstate and international commerce to customers throughout the United States.

38. The business activities of defendants that are the subject of this action were within the flow of, and substantially affected, interstate and foreign trade and commerce.

## VI.    FACTUAL ALLEGATIONS

**A.    Background of the International Airline Industry**

39. The international airline industry is characterized by what has been called "hub-and-spoke operations." A hub is an airport that an airline strategically designates as a transfer point to get passengers to destinations that are not served by direct flights. The hub and spoke system enables airlines to serve many more markets than they could with the same size fleet if they offered only direct, point-to-point service. The use of hub airports is efficient because it allows airlines to concentrate its human and technical resources in a few locations. Many airlines locate their hubs at airports in the cities of their head office.

40. There are preferential arrangements between hub-dominated airlines and their hub airports. Most hub airports will support only one or two airlines, insulating those airlines from competition. Routes served by one or two airlines, particularly flights originating or terminating at a hub airport that is dominated by a single airline, reflect a substantial amount of monopoly power. A January 2001 paper published by the U.S. Department of Transportation stated the following about hub airports in the United States:

/ / /

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT FOR DAMAGES

> From a consumer perspective, the primary disadvantage of network hubs is the level of market power that the hub carrier is capable of amassing and the higher prices consumers pay as a result. This stems form the fact that no airline with a similar cost structure can compete effectively at another airline's hub. [The Department of Transportation] and others have reported on the prevalence of high fares paid by passengers at hub airports dominated by a network carrier; indeed, no credible study concludes otherwise.

This market power advantage applies to international hubs as well.

41.    The airlines' market power is further bolstered for transpacific routes because unlike with short domestic flight routes, there are no reasonable substitutes for air travel. In addition, there is less competition from low-fare airlines in the international air travel market.

42.    The international hub airports in Asia include among others: (1) Tokyo Narita International Airport, which serves as a hub for All Nippon, Japan Air, and Northwest; (2) Osaka Kansai International Airport, which serves as a hub for All Nippon and Japan Air; (3) Taiwan Taoyuan International Airport, which serves as a hub for China Air and EVA Air; and (4) Singapore Changi International Airport, which serves as a hub for Singapore Air and Qantas.

43.    Like many other industries, the airline industry is cyclical with alternating periods of profits and losses. However, even in good years, profitability has been quite low – generally ranging from 2 to 3 percent net profit after interest and taxes. Historically, airlines have survived largely through state support, either in the form of equity or subsidies.

44.    Many airlines are now privately owned, either in whole or in part. Thus, they are facing the challenge of generating profit in what has historically been an unprofitable business.

45.    Full service airlines, like defendants, have a high level of operating costs necessary to establish and maintain air transportation services, including labor, fuel, aircrafts, spare parts, information technology networks and services, airport equipment, airport handling services, sales distribution, catering, training, and aviation insurance.

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT FOR DAMAGES

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

46.    In the past, airlines have attributed anywhere from 10 to 20 percent of their operating costs to jet fuel. Fuel costs among airlines vary significantly due to a number of unique factors. These factors include variable currency rates, the efficiency of aircrafts, air route designs, air traffic control, and the individual airline's fuel conservation efforts.

47.    Technological improvements have provided a 70 percent improvement in fuel efficiency in the last 30 years, and further incremental improvements are expected in the years ahead. Even existing aircrafts can be retrofitted to offer additional fuel savings of up to 3 to 5 percent.

48.    Fuel costs also vary among airlines because of the use of hedging, an investment strategy that locks in future fuel costs at a certain price. Different airlines hedge their fuel costs to different degrees. For example, in 2005, Thai Air hedged 31 percent of its annual fuel needs. In 2006, Qantas hedged 70 percent of its 2007 fuel costs. Air New Zealand has hedged 62 percent of its 2008 estimated fuel use.

49.    The airlines herein use differentiated pricing to set fares for passenger air transportation services. Differentiated pricing means that defendants sell air travel services at different fares, even for the same cabin on the same flight. Fares can vary depending on factors such as days of travel, days of stay, whether the fare is refundable, and seasonal discounts. Airlines often price air travel by dividing each cabin of an aircraft (*e.g.*, first, business, and economy) into a number of travel classes for pricing purposes. This makes fare comparison difficult for travelers.

50.    During the Class Period, the airlines herein have imposed fuel surcharges in addition to base fares for passenger air travel. Fuel surcharges are a separate component of the price of air travel that is supposed to assist airlines to recover fuel costs. The airlines justify their fuel surcharges by claiming that the surcharges are necessary to offset increases in jet fuel prices. Airlines advertise fares without including taxes, charges, and additional fees. In this regard, the true cost of passenger air transportation services is not readily apparent to travelers.

/ / /

51.    The fares for passenger air service, although not readily available to travelers for comparison, is available to the airlines.  For example, ATPCO is a company that collects and distributes, for a fee, airline fares and fare-related data to the industry.  This type of information within the industry has allowed defendants to monitor their conspiracy and verify that it is working.

**B.    Interrelationships Among Defendants**

52.    The international airline industry is distinguished by a number of interrelationships that create a high risk of collusion, including shared ownership, marketing alliances, and code sharing agreements.

53.    For example, Singapore Air owns 25 percent of Air New Zealand and 49 percent of Virgin Atlantic Airways.  From 1993 to September 2004, British Airways PLC ("British Air") owned 18.5 percent of Qantas.

54.    Since the late 1990s, marketing alliances among international airlines has become common.  The hub-and-spoke model of airline operations naturally strengthens these alliances because the alliances allow members to provide a greater number of connections.

55.    One of the most visible alliances is the Star Alliance, to which defendants Air New Zealand, All Nippon, Singapore Air, and Thai Air all belong.

56.    Qantas and British Air co-founded the Oneworld global alliance in 1998. Defendant Japan Air is now a member of that alliance.

57.    Code sharing is another type of popular airline partnership, which involves one airline selling tickets for another airline's flights under its own airline code.  This practice allows airlines to expand their operations on paper.

58.    Air New Zealand has code share agreements with Qantas and Singapore Air. Singapore Air's code share partners include All Nippon.  Japan Air is a code share partner of Thai Air.

59.    These types of marketing alliances have the potential for anticompetitive conduct, as described below by an Assistant Attorney General from the U.S. Department

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

1    of Justice's Antitrust Division in testimony given before the Senate Committee on

2    Commerce, Science and Transportation in 1999:

> [A]*irline marketing alliance . . . are essentially joint ventures between*
> *airlines.* These alliances fall somewhere between an outright merger and a
> traditional arm's-length interline agreement. Marketing alliances come in
> all shapes and sizes . . . Alliances involving code-sharing are in many
> respects the most controversial. They have the potential to be
> procompetitive – they can create new service, improve existing service,
> lower costs and increase efficiency, all to the benefit of the traveling public.
> *Code sharing agreements also have the potential to be anticompetitive.*
> *They can result in market allocation, capacity limitations, higher fares, or*
> *foreclosure of rivals from markets, all to the injury of consumers . . .* the
> greatest threat to competition comes when two of very few airlines that
> compete in a market enter into a code-sharing agreement in that market.

10    60.    In addition to their marketing relationships, the defendants in this case also

11    have close dealings through their participation in trade organizations.

12    61.    Each of the defendants herein is a member of the International Air Transport

13    Association ("IATA"), which describes itself as "the prime vehicle for inter-airline

14    cooperation in promoting safe, reliable, secure and economical air services . . . ." The

15    IATA collects and publishes industry intelligence and statistics, including route analysis of

16    operating and net margins, fuel consumption and unit fuel price paid, traffic figures, and

17    distribution of operating costs. Additionally, the IATA hosts multiple events each year for

18    its members, which provide an opportunity for executives from the airlines to socialize,

19    collaborate, and collude.

20    62.    In addition to their general memberships in the IATA, several of the

21    defendants in this case also serve on the organization's Board of Governors. In particular,

22    Singapore Air CEO Chew Choon Seng, Qantas CEO Geoff Dixon, and Japan Air President

23    Toshiyuki Shinmachi all serve on the IATA's Board.

24    63.    The Association of Asia Pacific Airlines ("AAPA") is another industry group

25    that facilitates defendants' close relations. Defendants Air New Zealand, All Nippon,

26    China Air, EVA Air, Japan Air, Qantas, Singapore Air, and Thai Air are all members of

27    the AAPA. According to the AAPA's website, "[t]he primary purpose of AAPA is to serve

28    as a common forum for the articulation of members' views on matters and issues of

1   common interest, to foster close cooperation and to bring about an atmosphere conducive

2   to the stimulation of the travel and tourism industry.  It also serves to enhance the role of

3   major airlines as instruments for international cooperation and growth in the economic,

4   social and cultural fields."

5       64.    Like the IATA, the AAPA collects and reports annual airport data, traffic

6   results, route statistics, financial indicators, fleet expansions, among other industry news.

7   These common associations facilitated the exchange of pricing information between

8   defendants.

9   **C.    Defendants' Collusive Conduct**

10      65.    Throughout the Class Period, defendants have engaged in the business of

11  selling passenger air transportation services containing transpacific flight segments to and

12  from the United States.

13      66.    Beginning on or about January 1, 2004, defendants conspired to fix the price

14  of passenger air transportation services containing transpacific flight segments to and from

15  the United States.  Defendants accomplished this conspiracy by participating in meetings,

16  conversations, and communications in which they agreed on the prices to be charged for

17  passenger air transportation services.

18      67.    Defendants' conspiracy is evidenced by, but not limited to, their parallel

19  pricing of fuel surcharges imposed on transpacific flights to and from the United States.

20      68.    The close timing and pricing of defendants' fuel surcharges were not

21  coincidences.  Rather, they were the product of a collusive agreement by and among

22  defendants to fix, raise, maintain, and stabilize the prices for transpacific flights.

23      69.    In fact, a recent position paper from the Centre for Asia Pacific Aviation, a

24  provider of aviation market intelligence, supports this conclusion.  The paper states that

25  "*Higher fuel prices drove the flag carriers away from the mindless chase after market*

26  *share into a more considered quest for profitability*."  [Emphasis added.]

27      70.    As a result of defendants' conspiracy, plaintiffs and members of the Class

28  paid supra-competitive prices for passenger air transportation services sold by defendants.

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT FOR DAMAGES

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

### 1.    Defendants' Fuel Surcharges Are Revenue Generators

71.    In 2004, some of the defendant airlines herein, among others, began imposing separate fuel surcharges on their flights.  Previously, such surcharges were built into ticket prices.  Although defendants claimed that these additional fuel surcharges were necessary to recoup increased costs, the surcharges did not actually reflect actual fuel costs, which as explained above, are dependent on numerous unique factors.

72.    In a truly competitive market, the imposition of a fuel surcharge by an airline that exceeds the actual cost of fuel consumed should create competition from others.  Here, however, defendants chose not to compete, and the only plausible explanation for that lack of competition is that defendants were conspiring.

73.    As the following aggregate industry data reported by the IATA in September 2007 demonstrates, the airline industry's operating profits were already declining before there was any substantial rise in fuel costs.  This data also shows that the airlines' fuel surcharges, which were implemented in 2004, were not a true cost recovery mechanism, but rather a camouflaged revenue generator.  Consequently, the airlines' use of fuel surcharges has allowed them to reach levels of profitability greater than what they had when fuel prices were stable.

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007f | 2008f |
|---|---|---|---|---|---|---|---|---|---|
| Passenger Revenues in Billions | $256 | $239 | $238 | $249 | $297 | $323 | $355 | $389 | $416 |
| Expenses in Billions | $318 | $319 | $311 | $323 | $376 | $409 | $440 | $473 | $500 |
| Crude Oil Price, Brent, $/barrel | $28.8 | $24.7 | $25.1 | $28.8 | $38.3 | $54.5 | $65.1 | $67.0 | $66.0 |
| Operating Profit in Billions | $1.1 | -$4.2 | -$3.7 | -$2.3 | -$1.5 | -$1.0 | -$0.1 | $1.1 | $1.5 |

CLASS ACTION COMPLAINT FOR DAMAGES

74.    The fact that defendants' fuel surcharges are revenue generators rather than a cost recovery mechanism is further evidenced by the record profits that defendants have experienced since implementing the surcharges.

75.    In the first quarter of fiscal year 2006, All Nippon posted a net profit of 7.68 billion yen.

76.    Thai Air posted a profit in the third quarter of 2006, during which period it collected nearly US$80 million in fuel surcharges. An August 10, 2006 article in *The China Post* quoted a securities analyst as saying that "'[t]he higher fuel surcharge in place was also quite effective'" in raising Thai Air's revenues.

77.    In the 12 months ending June 30, 2007, Qantas saw a 49.9 percent increase in net profit. The *Sydney Morning Herald* has reported that each AU$1 of Qantas' fuel surcharge on international flights translates to AU$10 million in annual revenue.

78.    On August 7, 2007, *The Japan Times* reported that Japan Air's operating loss shrank from 31.9 billion yen the prior year to 8.5 billion yen. The article further stated, "Yoshimasa Kanayama, [Japan Air] executive officer, *attributed the improved earnings performance to* the carrier's efforts to cut costs, brisk business demand for international flights, higher revenue per passenger achieved through fare hikes on domestic routes and *increased fuel surcharges on international flights*." [Emphasis added.]

79.    On August 28, 2007, Air New Zealand announced its net profit after tax was NZ$214 million, up 123 percent from the previous year. Notably, operating revenue increased 13 percent, while the number of passengers carried only increased 4.9 percent.

80.    The IATA has reported that whereas in 2002, airlines need an oil price of less than US$20 a barrel to break even, in 2007, they are profitable with oil prices at nearly US$70 a barrel.

81.    A January 2007 article in *Air Transport World* reported that "airlines are surfing a wave of earnings momentum" and forecasted that "2007 may well be the peak year in the current airline earnings cycle."

/ / /

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT FOR DAMAGES

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

**2.    Defendants Have Coordinated Their Fuel Surcharges**

82.    On May 11, 2004, Qantas and several other major airlines announced they would begin imposing fuel surcharges on passenger flights. Qantas' fuel surcharge – AU$15 for international flights – would go into effect on May 17, 2004 and would be *in addition to* increases in passenger fares. The very next day, Air New Zealand announced that it too would begin imposing fuel surcharges on passenger flights. Like Qantas, Air New Zealand's fuel surcharges of NZ$20 for international flights would go into effect on May 17, 2004.

83.    On June 7, 2004, China Air began collecting a US$7 fuel surcharge on passenger air travel, and Singapore Air began collecting a US$5 fuel surcharge on its flights.

84.    On August 20, 2004, Qantas announced the first of what would become several hikes in its fuel surcharges. Qantas' increased fuel surcharge was AU$22 for international flights. Six days later, Air New Zealand announced that it would raise its fuel surcharges as well.

85.    On October 20, 2004, Qantas raised fuel surcharges for the second time in less than six months. The fuel surcharge on international flights increased to AU$29. Notably, this increase was despite the fact that Qantas' fuel costs were fully hedged through the end of the year. The announcement also came just one day after Qantas reported a record full-year net profit of AU$648 million. Six days after Qantas raised its fuel surcharges, Air New Zealand followed by raising its own fuel surcharges for international flights.

86.    On November 1, 2004, EVA Air began collecting a US$17 fuel surcharge on air travel.

87.    Singapore Air raised its fuel surcharges on November 15, 2004.

88.    On February 1, 2005, All Nippon and Japan Airlines both implemented, for the first time, a fuel surcharge of US$24 on flights between North America and Japan. The same day, Singapore Air raised its fuel surcharge for international sectors to US$22.

89.    On March 28, 2005, Qantas raised fuel surcharges on international flights to US$35.  On April 6, 2005, Air New Zealand followed Qantas' lead by raising fuel surcharges on long haul sectors to NZ$52.

90.    Beginning May 1, 2005, Thai Air charged a US$25 fuel surcharge on international flights.

91.    On July 1, 2005, All Nippon and Japan Air simultaneously raised fuel surcharges on travel between North America and Japan.

92.    On August 1, 2005, Thai Air raised fuel surcharges on international flights, including the those to and from the United States, to US$35.  Later that month on August 16, 2005, it raised fuel surcharges on international flights to US$50.

93.    Air New Zealand raised fuel surcharges on August 22, 2005 to NZ$92 for international flights.  The next day, Qantas announced it would increase its fuel surcharges on international flights to AU$75.

94.    On October 13, 2005, Northwest raised its fuel surcharge on transpacific flights to US$65.

95.    On April 21, 2006, Qantas increased its fuel surcharges on international travel to US$65.  Three days later, Northwest raised its fuel surcharge to US$7.

96.    On May 15, 2006, China Air raised its fuel surcharge for travel between Taiwan and the United States to US$70 – ten times the original fuel surcharge implemented less than two years before.  On May 16, 2006, EVA Air raised its fuel surcharge for travel between Singapore and the United States to US$65.  On May 19, 2006, Singapore Air raised its fuel surcharges for international flights to US$90.  By May 22, 2006, Air New Zealand and Qantas were both charging US$65 in fuel surcharges for international flights.

97.    On June 1, 2006, Thai Air raised its fuel surcharges on travel between the United States and Bangkok to US$65, matching the fuel surcharges of EVA Air, Air New Zealand, and Qantas.  Interestingly, Thai Air decreased its fuel surcharges on regional flights at that time.

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT FOR DAMAGES

98.    On July 25, 2006, Northwest raised its fuel surcharge for travel between the United States and Singapore to US$90, the same surcharge previously implemented by Singapore Air.

99.    On August 24, 2006, China Air raised its fuel surcharge for flights to and from the United States to US$95.

100.    On August 31, 2006, Qantas raised surcharges again to AU$185, while keeping domestic fuel surcharges unchanged.

101.    Thai Air increased it fuel surcharges on international flights on September 1, 2006.  Six days later, United raised fuel surcharges on travel between the United States and Singapore to US$90, the same surcharge that Singapore Air and Northwest were charging.  Notably, September 2006 saw a ten percent decline in prices for crude oil – the largest decline in 21 months.

102.    On October 1, 2006, All Nippon and Japan Air both raised their fuel surcharges for transpacific travel to US$113.

103.    On October 14, 2006, Singapore Air lowered fuel surcharges for travel between the United States and Singapore to US$82.

104.    Following the lead of Singapore Air, on January 1, 2007, All Nippon and Japan Air lowered fuel surcharges on travel between North America and Japan to US$108.

105.    In January 2007, Qantas announced that due to a 25 percent drop in jet fuel prices over the preceding five months, it would reduce fuel surcharges on certain of its flights.  However, Qantas did not reduce the surcharges on any of its long-haul flights, including transpacific flights to or from the United States.  Consistent with Qantas, Air New Zealand's fuel surcharges on transpacific flights remained unchanged in early 2007.

106.    Singapore Air lowered its fuel surcharge on travel between the United States and Singapore to US$78 on February 1, 2007.

107.    On May 1, 2007, All Nippon and Japan Air both lowered fuel surcharges on international flights to US$91.

/ / /

CLASS ACTION COMPLAINT FOR DAMAGES

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

108.    On July 30, 2007, Northwest raised fuel surcharges for travel between the United States and Singapore to US$115.

109.    On August 10, 2007, EVA Air began charging a US$103 fuel surcharge on transpacific flights to the United States.

110.    On October 1, 2007, All Nippon and Japan Air raised their fuel surcharges to US$108. That same day, Thai Air raised fuel surcharges for travel between the United States and Thailand to US$140.

111.    By November 7, 2007, Singapore Airlines was charging US$104 in fuel surcharges for travel between the United States and Singapore.

112.    The following fares and surcharges published in November 2007 by www.flightstats.com show that defendants' collusive pricing is continuing:

**San Francisco to Auckland**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| Air New Zealand | Coach | $918 | $255 | $1173 |
| Qantas | Coach | $918 | $255 | $1173 |

**San Francisco to Bangkok**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| All Nippon | Coach | $650 | $281 | $931 |
| Japan Air | Coach | $620 | $281 | $901 |

**San Francisco to Hong Kong**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| All Nippon | Coach | $580 | $269 | $849 |
| Japan Air | Coach | $579 | $269 | $848 |

///

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT FOR DAMAGES

**San Francisco to Seoul**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| All Nippon | Coach | $620 | $296 | $916 |
| Japan Air | Coach | $620 | $289 | $909 |

**San Francisco to Sydney**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| Air New Zealand | Coach | $818 | $312 | $1130 |
| Qantas | Coach | $818 | $308 | $1126 |

**San Francisco to Taipei**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| EVA Air | Coach | $719 | $274 | $993 |
| Japan Air | Coach | $620 | $274 | $894 |
| Qantas | Coach | $1575 | $274 | $1849 |
| Singapore Air | Coach | $900 | $274 | $1174 |
| Thai Air | Coach | $1660 | $274 | $1934 |

**San Francisco to Tokyo**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| All Nippon | Coach | $529 | $270 | $799 |
| Japan Air | Coach | $529 | $270 | $799 |

**D.    Investigations by Competition Authorities**

113.    On August 1, 2007, the United States Department of Justice ("DOJ") indicted Korean Air Lines Co., Ltd. ("Korean Air"), a member of IATA and AAPA, for criminal antitrust violations.  The DOJ alleged that Korean Air conspired to fix the prices of "passenger fares to be charged on flights from the United States to Korea . . . ."  That same

CLASS ACTION COMPLAINT FOR DAMAGES

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

day, it was announced that Korean Air had agreed to plead guilty to the charges and pay $300 million in criminal fines.

114.    British Air, which was a shareholder in Qantas when Qantas first implemented fuel surcharges, has pleaded guilty to charges of antitrust violations and has agreed to pay $300 million in fines as well.  Those charges arose, in part, from British Air's levying of passenger fuel surcharges on transatlantic flights.

115.    On August 3, 2007, *Aviation Daily* reported that "Qantas revealed in legal documents that it has been involved in the investigations by various national authorities, and may be one of the carriers found to have breached competition laws."

116.    These admissions of culpability demonstrate that the structure of the international airline industry is conducive to anticompetitive conduct and that the conspiracy alleged herein is plausible.

## VII.    VIOLATIONS ALLEGED

117.    Plaintiffs incorporate by reference as if fully set forth, the preceding allegations of this Complaint.

118.    Although the exact start date of the conspiracy is unknown to plaintiffs, they believe that beginning in or about January 1, 2004, defendants, by and through their officers, directors, employees, agents, or other representatives, entered in a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. Section 1).

119.    Defendants, by their unlawful conspiracy, artificially raised, inflated and maintained the market price of passenger air transportation services containing transpacific flight segments as herein alleged.

120.    The contract, combination or conspiracy consisted of a continuing agreement, understanding, and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of passenger air transportation services containing transpacific flight segments between to and from the United States.

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT FOR DAMAGES

121.    Upon information and belief, for the purpose of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined or conspired to do, including:

    a.    participating in meetings, conversations, and communications to discuss the prices of passenger air transportation services;

    b.    agreeing to the prices that would be charged for passenger air transportation services;

    c.    issuing price announcements and price quotations in accordance with the agreements reached; and

    d.    engaging in meetings, conversations, and communications for the purpose of monitoring and adhering to the agreed-upon prices.

122.    As a direct result of the unlawful conduct of defendants and their co-conspirators in furtherance of their continuing contract, combination or conspiracy, plaintiffs and other members of the Class have been injured in their business and property in that they have paid more for passenger air transportation services than they would have paid in the absence of defendants' price fixing.

## VIII.  EFFECTS

123.    The above combination and conspiracy has had the following effects, among others:

    a.    price competition in the sale of passenger air transportation services by defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.    prices for passenger air transportation services sold by defendants has been raised, fixed, maintained and stabilized at artificially high and non-competitive levels throughout the United States; and

    c.    purchasers of passenger air transportation services from defendants have been deprived of the benefit of free and open competition in the purchase of such services.

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

124.   As a direct and proximate result of the unlawful conduct of defendants, plaintiffs and other members of the Class have been injured in their business and property in that they paid more for passenger air transportation services than they otherwise would have paid in the absence of the unlawful conduct of defendants.

## IX.   FRAUDULENT CONCEALMENT

125.   Plaintiffs had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to August 3, 2007, when it was reported that Qantas is involved in the investigations by competition authorities into price-fixing of air travel.

126.   Plaintiffs could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by the defendants and their co-conspirators to avoid detection and affirmatively conceal such violations including, without limitation, falsely attributing price increases to increased operating costs.

127.   Plaintiffs had no reason to disbelieve these statements which on their face appeared to be reasonable explanations for the pricing of passenger air transportation services.  Furthermore, most of the explanations provided by defendants involved non-public and/or proprietary information completely in defendants' control such that plaintiffs and members of the Class could not verify their accuracy.  Defendants' purported reasons for the price increases of passenger air transportation services prices were materially false and misleading and were made for the purpose of concealing defendants' anti-competitive scheme as alleged herein.  In truth, at all relevant times, the price of passenger air transportation services was artificially inflated and maintained as a direct result of the defendants' anti-competitive scheme, the operation of which was a substantial, but undisclosed, factor in the pricing of passenger air transportation services during the Class Period.

/ / /

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT FOR DAMAGES

128.    As a result of the fraudulent concealment of the conspiracy, plaintiffs assert the tolling of the applicable statute of limitations affecting the causes of action by plaintiffs and the members of the Class.

## X.    DAMAGES

129.    During the Class Period, plaintiffs and the other members of the Class purchased passenger air transportation services directly from defendants, or their subsidiaries, agents, and/or affiliates, and by reason of the antitrust violations herein alleged, paid more for such services than they would have paid in the absence of such antitrust violations.  As a result, plaintiffs and the other members of the Class have sustained damages to their business and property in an amount to be determined at trial.

## XI.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment against defendants as follows:

A.    A declaration that this action is a proper class action under Federal Rule of Civil Procedure 23(b)(3) on behalf of the Class defined herein, and an Order directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each member of the Class;

B.    A declaration that the unlawful combination and conspiracy alleged herein is an unreasonable restraint of trade of commerce in violation of Section 1 of the Sherman Act (15 U.S.C. Section 1);

C.    An injunction enjoining, preliminarily and permanently, defendants from continuing the unlawful combination and conspiracy alleged herein;

D.    An award to plaintiffs and each member of the Class damages, as provided by law, and joint and several judgments in favor of plaintiffs and each member of the Class against defendants, and each of them, in an amount to be trebled in accordance with the antitrust laws;

E.    An award to plaintiffs and the Class for the costs of this suit (including expert fees), and reasonable attorneys' fees, as provided by law; and

///

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

CLASS ACTION COMPLAINT FOR DAMAGES

1    F.    An award for such other and further relief as the nature of this case may

2  require or as this court deems just, equitable and proper.

3                                      **JURY DEMAND**

4    Plaintiffs demand a jury trial, pursuant to Federal Rule of Civil Procedure 38(b) of

5  all triable issues.

6

7  DATED:  November 21, 2007          By: _____

8                                        Bruce L. Simon (Bar No. 92641)
                                           bsimon@psswplaw.com
9                                        Esther L. Klisura (Bar No. 221171)
                                           eklisura@psswplaw.com
10                                       PEARSON, SIMON, SOTER,
                                           WARSHAW & PENNY, LLP
11                                       44 Montgomery Street, Suite 1200
                                         San Francisco, CA 94104
12                                       Telephone:  (415) 433-9000
                                         Facsimile:   (415) 433-9008

13

14                                       Clifford H. Pearson (Bar No. 108523)
                                           cpearson@psswplaw.com
15                                       Gary S. Soter (Bar No. 67622)
                                           gsoter@psswplaw.com
16                                       Daniel L. Warshaw (Bar No. 185365)
                                           dwarshaw@psswplaw.com
17                                       PEARSON, SIMON, SOTER,
                                           WARSHAW & PENNY, LLP
18                                       15165 Ventura Boulevard, Suite 400
                                         Sherman Oaks, CA 91403
19                                       Telephone:  (818) 788-8300
                                         Facsimile:   (818) 788-8104

20

21                                       Thomas V. Girardi (Bar No. 36603)
                                           tgirardi@girardikeese.com
22                                       Jennifer Lenze (Bar No. 246858)
                                           jlenze@girardikeese.com
23                                       GIRARDI KEESE
                                         1126 Wilshire Boulevard
24                                       Los Angeles, CA 91101
                                         Telephone:  (213) 977-0211
25                                       Facsimile:   (213) 481-1554

26                                       *Attorneys for Plaintiffs and the Proposed
                                         Class*

27

28

PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104

24

CLASS ACTION COMPLAINT FOR DAMAGES